# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

————————————

Nº 06-CV-3589 (JFB) (ARL)

————————————

MARY HOLLMAN, Individually and
as the Administrator of the Estate of SAMUEL A. COX,
and the Estate of SAMUEL A. COX, on behalf of decedent JOHN COX,

Plaintiff,

VERSUS

COUNTY OF SUFFOLK,
SUFFOLK COUNTY POLICE DEPARTMENT, Suffolk Homicide Commander Det. Lieutenant
JACK FITZPATRICK, in his individual and official capacity,
POLICE OFFICERS "JOHN DOE" 1 through 10, whose names are known by the Defendants but
as of yet are not known by Plaintiffs, OFFICE OF THE SUFFOLK COUNTY MEDICAL
EXAMINER, CHARLES WETLI, M.D., Medical Examiner, in his individual and official
capacity, JAMES C. WILSON, M.D., Deputy Medical Examiner, in his individual and official
capacity, BROOKHAVEN MEMORIAL HOSPITAL MEDICAL CENTER, SOUTH COUNTRY
AMBULANCE, EMT L. SMITH, in his individual and official Capacity, EMT D. TOTONG,
in his individual and official capacity, EMT S. AL QADRI, in his individual and official
capacity, and AMBULANCE DRIVER M. SNEED, in his individual and official capacity,

Defendants.

————————————

**MEMORANDUM AND ORDER**
June 15, 2011

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Mary Hollman (hereinafter, "plaintiff") brought the instant action on behalf of decedent John Cox (hereinafter, "Cox" or "decedent") regarding the incidents surrounding Cox's death on April 22, 2005. Plaintiff seeks damages against a number of defendants,

including the County of Suffolk, certain Suffolk County Police Officers, the Office of the Suffolk County Medical Examiner and several of its employees, Brookhaven Hospital Memorial Medical Center, and South Country Ambulance and certain emergency medical technicians ("EMTs") who are members of the South Country Ambulance company,

under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, 42 U.S.C. §§ 1981, 1983, 1985 and 1986, and various New York state law causes of action, including negligence and wrongful death. Defendants South Country Ambulance, EMTs Smith, Totong, Al Qadri and Ambulance Driver Sneed (collectively, "Ambulance Defendants") now move for summary judgment on all claims, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion is granted in its entirety, and the Ambulance Defendants are terminated from the above-captioned case.[1]

## I. Background

### A. Facts

The facts described below are taken from the parties' depositions, affidavits, and exhibits, and the parties' respective Rule 56.1 statement of facts ("Defs.' 56.1" and "Pl.'s 56.1"). Unless otherwise noted, the facts are undisputed. Upon consideration of the motions for summary judgment, the Court shall construe the facts in the light most favorable to plaintiff, the non-moving party. *See Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

On April 22, 2005, Cox, a thirty-nine year old African American male, was visiting his girlfriend at a residence in Bellport, New York. (Am. Comp. ¶ 43; Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶

1.) At some point prior to 8 p.m., individuals present at the residence called the Suffolk County Police Department, requesting assistance because Cox was agitated. (Am. Compl. ¶ 44; Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) The police arrived at the residence around 8:00 p.m., and arrested Cox. (Am. Compl. ¶ 45; Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)

The parties dispute the extent to which Cox struggled with the police officers when they attempted to arrest him. (Defs.' 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) Plaintiff's complaint alleges that the officers ordered the other residents outside the house, closed the blinds, and assaulted Cox. (Am. Compl. ¶¶ 47-48.) Specifically, plaintiff claims that the officers stomped on Cox's head and body, kicked him in the groin, and shocked him with a Taser gun multiple times, which caused third-degree burns. (Am. Compl. ¶¶ 49-50.)

Sergeant Kevin Lixfield of the Suffolk County Police Department was the senior officer at the scene during the incident and made a radio call for an ambulance.[2] (Defs.' 56.1 ¶¶ 5-6.) The Ambulance Defendants arrived on the scene at approximately 8:27 p.m. (Pl.'s Counter-Statement of Material Facts In Dispute (hereinafter, "Pl.'s Counter 56.1") ¶ 42.) Sergeant Lixfield was standing outside the residence when the Ambulance Defendants arrived, and reported to EMT Smith that Cox was an emotionally disturbed

---

[1] Brookhaven Memorial Hospital Medical Center ("Brookhaven") was terminated from the above-captioned case pursuant to this Court's Memorandum and Order, dated January 27, 2011 (the "January 27 Memorandum and Order"), in which this Court granted in its entirety Brookhaven's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

[2] The parties dispute whether the initial purpose of Sergeant Lixfield's call for an ambulance was to transport Cox to a hospital. (Pl.'s 56.1 ¶ 6.) In particular, plaintiff points to the fact that Lixfield testified at his deposition that he also called for a police van to respond to the residence at the same time. (*Id.*)

person, and violent.[3] (Pl.'s Counter 56.1 ¶ 43.) EMT Smith entered the bedroom of the residence, where he witnessed four to five police officers restraining Cox on the bed, while placing him in handcuffs. (Pl.'s Counter 56.1 ¶¶ 46-47.) While EMT Smith was in the residence, he did not witness Cox striking the police officers, but did observe the officers using a Taser on Cox. (*Id.* ¶¶ 50, 76, 148, 160-61.) Upon request, EMTs Smith and Totong brought a stretcher to the main area of the house, and the police placed Cox face down on the stretcher, with his hands and legs cuffed. (*Id.* ¶¶ 48-49, 51.) EMTs Smith and Totong applied straps to secure Cox to the stretcher. (*Id.* ¶¶ 51, 61.) During the time that the EMTs were in the residence, EMT Smith prepared a rebreather mask to supply oxygen to Cox, but the officers ordered him not to apply the mask. (*Id.* ¶¶ 59, 60.)

EMTs Smith and Totong assisted the police in carrying Cox, on the stretcher, to the ambulance. (*Id.* ¶ 61.) Cox was positioned incorrectly in the ambulance, face down on the stretcher, with his head facing the rear doors of the ambulance. (*Id.* ¶¶ 34, 62.) EMT Smith advised the police officers at the scene that Cox should be repositioned so that he was face up, with his head at other end of the stretcher, but he was rebuffed by the police officers, who reported that repositioning Cox would be unsafe. (*Id.* ¶¶ 62, 63.)

Cox remained in police custody during the ambulance ride to Brookhaven Memorial Hospital Medical Center. (Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.) Smith and Totong rode in the

back of the ambulance with three police officers who were restraining Cox. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) Specifically, plaintiff alleges that one police officer was sitting on Cox's lower back, another was sitting on his legs, and another was restraining his neck by applying pressure on the back of his neck for the entire journey to the hospital. (Pl.'s Counter 56.1 ¶ 20.) During the ambulance ride, the police officers directed Smith to not provide Cox with medical treatment. (Defs.' 56.1 ¶¶ 11, 14; Pl.'s 56.1 ¶¶ 11, 14.) Smith attempted to apply the rebreather mask a second time, but was again ordered not to by the police officers, because they advised him that Cox was still combative. (Pl.'s Counter 56.1 ¶ 64; Pl.'s Ex. G at 93.)

The ambulance arrived at the hospital at approximately 8:42 p.m. (*Id.* ¶ 67.) After Cox was removed from the ambulance, he was no longer combative. (*Id.* ¶ 72.) Cox was brought into the trauma room at the hospital, but the police would not allow a registered nurse to transfer Cox to a hospital stretcher without hospital restraints because they claimed Cox to be combative. (*Id.* ¶¶ 70, 146.) While the hospital staff retrieved restraints, Smith observed that Cox was not moving or speaking, and that the police officer was still holding the back of Cox's neck. (*Id.* ¶ 71.) After the hospital staff returned with restraints, Cox was uncuffed, turned over, and it was discovered that he was in cardiac arrest. (*Id.* ¶ 73.) The EMTs were then instructed to leave the room. (*Id.* ¶ 73.) At approximately 8:50 p.m., Cox had no recordable blood pressure, no pulse and a respiratory rate of zero. (*Id.* ¶ 74.) Cox was officially pronounced dead at 9:37 p.m. (*Id.* ¶ 97.)

---

[3] Plaintiff alleges that Cox had been diagnosed with schizophrenia and acute bipolar mania on or around 1986, and had been receiving medical treatment for his mental conditions since at least April 2005. (Am. Compl. ¶ 38.)

EMT Smith did not leave a Prehospital Care Report at the hospital when Cox was admitted. (*Id.* ¶ 79.)  While at the hospital, EMT Smith contacted the chief of his company, who instructed him not to submit any statements until the ambulance company's attorney was notified.  (*Id.* ¶¶ 66, 79.) That report was submitted at a later date, and included as the chief complaint a description that "[a]s per PD, emotionally disturbed person, violent." (*Id.* ¶ 43.) The report only indicated injuries to Cox's hands and arms. (*Id.* ¶ 162.) EMT Smith also completed an Incident Report Form which indicated that "the police department was advising me that it was, in my opinion, in my best interest that I didn't interact with the patient." (*Id.* ¶ 65.)

### B. Procedural History

Plaintiff filed the complaint in the instant action on July 21, 2006. An amended complaint was filed on November 10, 2006. On April 29, 2009, the Ambulance Defendants filed the instant motion for summary judgment. Plaintiff filed opposition papers to the motion for summary judgment on July 1, 2009, and the Ambulance Defendants filed their reply papers on July 28, 2009. The Court held oral argument on the instant motion, and other related motions on August 24, 2009.  On November 24, 2009, plaintiff filed a supplemental declaration in support of plaintiff's memorandum of law in opposition and, on January 15, 2010, the Ambulance Defendants filed a sur-reply.  This matter is fully submitted.[4]

### II. STANDARD OF REVIEW

The standards for summary judgment are well settled.  Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that he or she is entitled to summary judgment.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

---

[4] In particular, at the February 7, 2011 conference, the Ambulance Defendants orally renewed their motion for summary judgment and counsel for the Ambulance Defendants and plaintiff both agreed, as discussed *infra*, that although discovery related to plaintiff's expert submissions was ongoing, those submissions did not pertain to the claims against the Ambulance Defendants.  Thus, the parties agreed that the Ambulance Defendants' motion for summary judgment was fully submitted and ready for a decision by the Court.

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone "will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars' showing that a trial is needed." *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

Plaintiff alleges federal causes of action for violations of Cox's civil rights under 42 U.S.C. §§ 1981, 1983, 1985 and 1986 against the Ambulance Defendants. In addition, plaintiff alleges causes of action under New York common law for negligence and wrongful death. For the reasons discussed below, the Court finds that summary judgment should be granted on all of plaintiff's claims as against the Ambulance Defendants.

### A. Claims Arising Under 42 U.S.C. § 1983

In order to prevail on a federal civil rights action under Section 1983, a plaintiff must demonstrate: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). However, even if a plaintiff has adequately alleged a constitutional injury, a Section 1983 claim cannot be successful unless it can be demonstrated that such injury was caused by a party acting under the "color of state law," and thus the central question is whether the alleged infringement of federal rights is "fairly attributable to the state." *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 937 (1982); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.").

As a baseline matter, private citizens and entities are not generally subject to Section 1983 liability. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 323-34 (2d Cir. 2002); *Reaves v. Dept. of Veterans Affairs,* No. 08-CV-1624 (RJD), 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no

matter how discriminatory or wrongful.'" (quoting *Am. Mfrs. Mut. Ins. Co v. Sullivan*, 526 U.S. 40, 50 (1999))). However, "the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate.' ('the public function test')." *Sybalski v. Indep. Gr. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)); *see also Luciano v. City of N.Y.*, No. 09-CV-0539 (DC), 2009 WL 1953431, at *2 (S.D.N.Y. July 2, 2009) (stating that a private entity may only be considered a state actor for the purposes of § 1983 if the private entity fulfills one of the "state compulsion," "public function" or "close nexus" tests); *accord Faraldo v. Kessler*, No. 08-CV-0261 (SJF), 2008 WL 216608, at *4 (E.D.N.Y. Jan. 23, 2008). "It is not enough, however, for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*' giving rise to the action." *Sybalski*, 546 F.3d at 258 (citing *Schlein v. Miford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977) (emphasis in original). A plaintiff "bears the burden of proof on the state action issue." *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1083 n.3 (2d Cir. 1990), *cert. denied*, 499 U.S. 960 (1991).

In the instant case, it is undisputed that South Country Ambulance Company and its volunteer EMTs are private parties. Plaintiff argues, however, that the Ambulance Defendants should be considered to be acting under the color of state law under the public function and "symbiotic relationship" tests.[5] For the reasons stated below, even crediting plaintiff's evidence and drawing all reasonable inferences in plaintiff's favor, there is insufficient evidence from which a rational jury could find that the Ambulance Defendants acted under the color of state law. Thus, her § 1983 claims cannot survive summary judgment.

### 1. Public Function Test

The public function exception to the rule that private conduct is not ordinarily

---

[5] Plaintiff actually asserts that the Ambulance Defendants are state actors under the "close nexus" test, but in support of such proposition focuses on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) and *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17 (2d Cir. 1979), which both addressed the more specific "symbiotic relationship" test instead. (Pl.'s Mem. of Law in Opp. to Ambulance Defs.' Mot. for Summ. J. (hereinafter, "Pl.'s Mem. in Opp.") at 4-5.) It is clear from the case law that the "symbiotic relationship" test is one mechanism by which a plaintiff can prove the requisite "joint action" or "close nexus" for state action under Section 1983. *See, e.g., Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 105 (2d Cir. 1993) ("There must be either a *symbiotic relationship* between the state and the defendant, such as, for example, a direct financial stake by the state in a business, or a *close nexus* between the state and alleged wrongful conduct.") (emphasis added). Thus, the Court construes plaintiff's argument as one made under the "symbiotic relationship" test. In any event, even if plaintiff also is asserting state action separately under the "close nexus"/ "joint action" test, or the "compulsion" test, the Section 1983 claims still cannot survive summary judgment, for the reasons discussed *infra*.

actionable under § 1983 is narrow. As the Supreme Court has instructed, "the relevant question is not simply whether a private group is serving a 'public function' . . . [T]he question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1983) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)) (emphasis added); *accord Sybalski*, 546 F.3d at 259; *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 152 (2d Cir. 2004) (finding no state action under public function test where function at issue not "traditionally associated with sovereignty") (internal citation and quotation marks omitted).

First, that ambulatory services may be subject to extensive regulation by the New York State Health Department, and subject to other testing and certification requirements, does not establish such services as traditional state services for the purposes of the public function test. Although New York may regulate ambulatory services, the plaintiff has not shown that these regulations require the state or any local municipality to provide ambulance services. *See Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (finding nursing home services not public function, despite extensive New York state regulation, where no regulatory provisions required State to provide services itself); *see also McKinney v. West End Voluntary Ambulance Ass'n*, 821 F. Supp. 1013, 1018 (E.D. Pa. 1992) (volunteer ambulance services not public function by virtue of Pennsylvania Emergency Medical Services Act, where the regulations promulgated under that statute did not impose an obligation on the Commonwealth

of Pennsylvania to provide ambulance services).[6]

Similarly, plaintiff's argument that the Ambulance Defendants fall under the public function exception because they receive some government funding support through a special ambulance tax district is without merit; it is well-settled that "receipt of state funds [alone] is . . . insufficient to transform . . . private actions into state actions." *Alcena v. Raine*, 692 F. Supp. 261, 267 (S.D.N.Y. 1998); *see Rendell-Baker v. Kohn*, 457 U.S. at 840-43 (finding private school, which received ninety percent of funds from government and was extensively regulated, was not a state actor within meaning of Section 1983); *see also Blum*, 457 U.S. at 1011-12 (finding no state action notwithstanding fact that state paid medical expenses of more than ninety percent of the patients and subsidized the operating and capital costs of the nursing homes); *Arons v. State of N.Y.*, No. 04-CV-0004 (DLC), 2004 WL 1124669, at *6 (S.D.N.Y. May 20, 2004) ("The receipt of public funds by a private

---

[6] Along a similar vein, plaintiff's citation to the United States Supreme Court decision in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985) does not support the proposition that ambulatory services are a function that are traditionally left to the exclusive prerogative of the state for the purposes of the "public function" test. That case merely stands for the fact that the *regulation* of ambulatory services by governmental entities is traditional, for the purposes of Tenth Amendment state government immunity from federal regulation under *National League of Cities v. Usery*, 426 U.S. 833 (1976) and its progeny. Whether or not the *regulation* of ambulatory services is traditionally performed by state government is not the central question; rather, the issue is whether the *services* themselves have traditionally been *provided* exclusively by the state.

entity, no matter how extensive, is insufficient in and of itself to establish state action."); *Archer v. Economic Opp. Comm'n of Nassau Co., Inc.*, 30 F. Supp. 2d 600, 605 (E.D.N.Y. 1998) ("The United States Supreme Court has repeatedly held that a private entity's dependence on government funding does not make the organization a state actor.").

Plaintiff also argues that the public function exception applies because the Ambulance Defendants perform particular activities which plaintiff claims to be "public," including patrolling county parks and federal parks within the district, and providing medical aid in such districts. As a threshold matter, the Supreme Court has rejected the argument that provision of services to the public converts an action into a public function. *See Jackson*, 419 U.S. at 352-54 (rejecting broad principle under public function test that all businesses affected with the public interest are state actors); *McKinney*, 821 F. Supp. at 1019 ("[T]he relevant inquiry under this standard is not just whether the private entity is serving a public function, but whether such a function is "'traditionally the *exclusive* prerogative of the State.'") (quoting *Rendell-Baker v. Kohn*, 457 U.S. at 842) (emphasis in original). Moreover, even assuming *arguendo* that providing ambulatory services on county or federal land is traditionally the exclusive prerogative of the state, these activities are wholly unrelated to the alleged injury at issue in the instant case–plaintiff's injuries did not arise from the Ambulance Defendants' patrols of such public land–and therefore are inapplicable to the state action analysis. *Cf. Schlein,* 561 F.2d at 428 (plaintiff must alleged that state was involved "with the activity that caused the injury" giving rise to the action). Similarly, that the Ambulance Defendants receive calls through a county-run emergency 911 dispatch system does not convert them into state actors where the dispatch is itself unrelated to the

alleged constitutional harm in the instant case. *See, e,g., Doe v. Harrison*, 254 F. Supp. 2d 338, 344-45 (S.D.N.Y. 2003); *see also McKinney*, 821 F. Supp. at 1020 ("[R]eceiving emergency calls through a government-operated system is no more persuasive than the fact of regulation or funding in demonstrating that the government was responsible for [a private party's] conduct.").

Finally, the Court notes that whereas plaintiff has failed to point to a single instance in which a court has determined ambulatory services to fall within the ambit public function exception, a number of courts have held otherwise. *See, e.g., Groman v. Township of Manalapan*, 47 F.3d 628, 641 (3d Cir. 1995) (holding that a volunteer first aid squad was not a state actor under public function test); *Gallegos v. Slidell Police Dept.*, No. 07-CV-6636, 2008 WL 1794170 (E.D. La. Apr. 18, 2008) (finding medical services of ambulance driver not exclusive prerogative of state for public function test); *McKinney,* 821 F. Supp. at 1018-20 (holding volunteer ambulance company not state actor under public function test); *Krieger v. Bethesda-Chevy Chase Rescue Squad*, 599 F. Supp. 770, 773 (D.C. Md. 1984) (rescue or ambulance service not a public function), *aff'd without opinion*, 792 F.2d 139 (4th Cir. 1986); *Eggleston v. Prince Edward Volunteer Rescue Squad, Inc.*, 569 F. Supp. 1344, 1350-51 (E.D. Va. 1983) (finding emergency transportation service more akin to a private function, and not a function that is traditionally the exclusive prerogative of the government), *aff'd without opinion*, 742 F.2d 1448) (4th Cir. 1984).

Accordingly, the undisputed facts in this case demonstrate as a matter of law that the Ambulance Defendants cannot be considered to have been operating under the "color of

state law" pursuant to the public function test, and, thus, any claim under that test cannot survive summary judgment.

## 2. Symbiotic Relationship Test

The Court also concludes that no rational jury could conclude that the Ambulance Defendants are state actors for § 1983 purposes under the "symbiotic relationship" test established by the United States Supreme Court in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856 (1961).

According to *Burton,* actions of a private party can be considered state action if the state has "so far insinuated itself into a position of interdependence with [the acting party] that it must be recognized as a joint participant in the challenged activity . . ." 365 U.S. at 725. The Supreme Court applied this test in *Burton* to find that a private restaurant located within a public parking garage, which discriminated based on race, was involved in state action because mutual benefits were conferred, and the restaurant operated physically and financially "as an integral part of a public building devoted to a public parking service." *Id.* at 724. In the other case cited by plaintiff, *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17, 23 (2d Cir. 1979), the Second Circuit applied the *Burton* symbiotic relationship test to find state action on the part of a volunteer fire department, where there the state was extensively involved and intertwined with the fire company, noting that the fire company occupied land and buildings owned by the town, used equipment owned by the town, and had its operations overseen by the locality (which retained final approval regarding the selection of the company's chief in command).

In the instant case, there is no evidence that the Ambulance Defendants and the state were so interdependent such that the symbiotic test is applicable. First and foremost, there is no indication that the state had a *direct proprietary* interest in the operations of the South Country Ambulance company, a requirement which has been deemed critical by subsequent Supreme Court and Second Circuit precedent. *See Rendell-Baker*, 457 U.S. at 842-43 (declining from finding symbiotic relationship, distinguishing *Burton* on the basis that the private party in that case was located on public property and rent payments directly supported the public entity); *Hadges*, 918 F.2d at 1082 ("In contrast to *Burton,* the State in the instant case does not have a proprietary interest in [private party defendant].")*; accord Calderon v. Burton*, 457 F. Supp. 2d 480, 488 (S.D.N.Y. 2006); 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.13[A] at 5-90-5-91, 5-94 (4th ed. 2003) ("The lower federal courts generally follow the present Supreme Court's reading of *Burton* that the most significant fact that led to the finding of state action was the public authority's profiting from the restaurant's discrimination."). In the instant case, unlike *Janusaitis*, there is no indication that the state owned the land or all the equipment used by the South Country Ambulance company, or that it was directly managed or operated by government officials. *Forbes v. City of N.Y.*, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12, 2008) ("[T]he weight of authority suggests that *Burton* itself is highly circumscribed authority . . . [w]hen courts do apply the symbiosis factor, they often examine whether the government has control over the private actor's 'day-to-day' operations and whether the government shares in any profits the private entity has generated *from the challenged conduct*.") (internal citations and quotation marks omitted) (emphasis in original); *McKinney*, 821 F.

Supp. at 1019 (rejecting application of *Burton* symbiotic relationship doctrine to volunteer ambulance company that owned building equipment, and did not have its membership appointed by government officials). Plaintiff can only point to the fact that the Ambulance Defendants are regulated by the State and receive funding support from an ambulance tax district, but such facts alone are insufficient to satisfy the symbiotic relationship test as a matter of law, and (as discussed *supra*) are insufficient to characterize a private party's activities as state action for the purposes of § 1983. *See, e.g., Blum v. Yatresky*, 457 U.S. 991 (1982) (rejecting argument that state subsidization of operating and capital costs of nursing homes, payment of the medical expenses of more than 90% of the patients, and the licensing of such facilities created symbiotic relationship between the State and homes); *Archer v. Economic Opportunity Com'n of Nassau Co., Inc.*, 30 F. Supp. 2d 600, 605 (E.D.N.Y. 1988) (rejecting application of symbiotic relationship test where private entity received 95 percent of funding from state and was subject to regulation; "[t]he United States Supreme Court has repeatedly held that a private entity's dependence on government funding does not make the organization a state actor").

Accordingly, even accepting plaintiff's evidence as true and drawing all reasonable inferences in her favor, no rational jury could find that the Ambulance Defendants should be considered to have been operating under the "color of state law" pursuant to the symbiotic relationship test and, thus, any claim under that test cannot survive summary judgment.

### 3. Joint Action/Compulsion Test

The Court notes that the plaintiff did not raise the compulsion test in support of its contention that the Ambulance Defendants were acting under the "color of state law" for § 1983 purposes. However, because the Constitutional harm in the instant case allegedly caused by the defendants involved a failure to provide medical care, and that alleged harm was a result of the officers' direct orders that the Ambulance Defendants not provide medical care to decedent, a discussion of the joint action and compulsion tests is warranted. For the reasons stated below, the Court finds that, even if plaintiff had adequately raised these tests, any arguments for the application of the joint action doctrine or compulsion tests would be without merit. Specifically, even accepting plaintiff's evidence as true, no rational jury could conclude that the Ambulance Defendants *willingly* participated in denying decedent medical care where it is undisputed that the EMTs repeatedly requested to render medical care and were denied by the police officers who had the decedent in custody.

Under the "joint action" doctrine, a private actor can be found "to act under color of state law for § 1983 purposes if . . . [the private party] is a willful participant in joint action with the State or its agents". *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes*, 2008 WL 3539936, at *5 (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272 (2d Cir. 1999)). To establish joint action, "a plaintiff must show that the private citizen and the state official shared a common unlawful goal." *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996); *see also Burrell v. City of Mattoon*, 378 F.3d 642, 650 (7th Cir. 2004) (under joint action requirement, plaintiff must show that "both

public and private actors share a common, unconstitutional goal").

Here, any contention for the application of the joint action doctrine would be without merit, because it is uncontested that the Ambulance Defendants did not *willingly* participate in joint action with the defendant police officers in denying decedent medical treatment while in custody. Specifically, the undisputed record reflects that EMT Smith attempted several times to render medical care, but was repeatedly ordered not to provide such assistance by the police officers who had Cox in custody. The Court concluded previously, with respect to defendant Brookhaven, that it cannot be said that the Ambulance Defendants shared a common, unconstitutional goal where they would have provided care but for explicit police orders to stand down. *See* January 27 Mem. & Order, at *8; *See, e.g., Harvey v. Plains Twp. Police Dept.*, 421 F.3d 185, 195-196 (3d Cir. 2005) (finding that private landlord defendant was not acting under "color of state law" based on joint action because private party was not *willful* participant; "a private citizen acting at the orders of a police officer is not generally acting in a willful manner, especially when that citizen has no self-interest in taking the action"). Where as here, the decedent was in police custody, and it is undisputed that the police officers ordered the Ambulance Defendants to stand down from attempting to provide medical treatment, the Ambulance Defendants cannot be said to be willful participants. Thus, any claim that the Ambulance Defendants should be considered to have been operating under the "color of state law" pursuant to the "joint action" doctrine test cannot survive summary judgment.

Moreover, although it can be fairly said from the above that the record supports the proposition that the alleged Constitutional violation was *compelled* by the state – insofar as the police officers ordered the Ambulance Defendants not to provide medical treatment – the Court finds that the Ambulance Defendants cannot be held liable for such compelled acts resulting from a police order, absent evidence of willfulness. Although the Second Circuit has not directly confronted this issue, the Court agrees with the approach taken by the Third and Ninth Circuits, which have found that a private party cannot be held liable based on alleged unconstitutional actions that are the result of government compulsion alone. *See Harvey*, 421 F.3d at 196 (finding private party not liable for alleged unconstitutional act which was performed pursuant to a police order; "[the private party] would therefore not be liable here because she had not wilfully participated in the state action, as compulsion by the state negates the presence of wilfulness"); *see also Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 838, 843 (9th Cir. 1999) (holding that "a plaintiff must show 'something more' than state compulsion, typically willful participation, in order to hold a private defendant liable as a government actor"). This is not to say that no party may be held accountable for the alleged violation of constitutional rights by a private party; as noted by the Ninth Circuit in *Sutton*, the Supreme Court has plainly held that the *government* may be held liable, where it compels a private party to violate constitutional rights. *See id.* (citing *Peterson v. City of Greenville*, 373 U.S. 244, 247-48 (1963) (holding that city could not escape liability for racial discrimination committed by private entity, where discrimination was compelled by city ordinance requiring segregation); *Harvey*, 421 F.3d at 196 n.13 ("[I]t seems entirely proper to find that the state actor engaged in state action, including whatever actions the private party was

compelled to take."). In circumstances in which the government pressures another party to commit an unlawful act, "the state is undeniably the party who is 'responsible for that act.'" *Sutton*, 192 F.3d at 838. However, it is inequitable to hold the private party liable, where, as here, the undisputed record supports the proposition that the private party would not have committed the alleged unconstitutional act but for the direct police order. As discussed by the Ninth Circuit in *Sutton*:

> [W]e would expect that the private defendant is *not* responsible for the government's compulsion: "The logical conclusion of [*Peterson v. City of Greenville*, 373 U.S. 244 (1963)] is that only the state actor, and not the private party, should be held liable for the constitutional violation that resulted from the state compulsion. When the state compels a private party to discriminate against members of a racial minority, it is the state action, not the private conduct, which is unconstitutional. . . [A] private party in such a case is 'left with no choice of his own' and consequently should not be deemed liable."

*Id.* (quoting Barbara Rook Snyder, *Private Motivation, State Action, and the Allocation of Responsibility for Fourteenth Amendment Violations*, 75 CORNELL L. REV. 1053, 1067, 1069 (1990) (footnote omitted)).

Accordingly, because the alleged constitutional violation in the instant case was compelled by the orders of the police officers, and it cannot be fairly said that plaintiff willingly participated in the alleged deprivation, the alleged unlawful acts are fairly imputed to the officers and not the Ambulance Defendants. *See Harvey*, 421 F.3d at 196 n.13 (holding private party not liable for alleged unconstitutional actions unwillingly committed by private individual based upon police order; imputing action committed by private party to officers for liability purposes). The police officers are defendants to the instant action, and are the appropriate parties which may be potentially held liable for the alleged constitutional deprivation of medical treatment to decedent while he was in their custody, if proven at trial.

\*     \*     \*

In sum, even crediting plaintiff's evidence and drawing all reasonable inferences in her favor, there is insufficient evidence from which a rational jury could find the South Country Ambulance Company, and its volunteer EMTs, were acting under "color of state law" for the purposes of 42 U.S.C. § 1983. Accordingly, summary judgment is granted with respect to all claims alleged against the Ambulance Defendants under § 1983.[7]

---

[7] The Court rejects the Ambulance Defendants' argument that the claims arising under 42 U.S.C. §§ 1981, 1985, and 1986 must also be dismissed by virtue of the fact that they are private parties not operating under "color of state law"; it is well-settled that the state action requirement is not applicable to claims brought under those civil rights statutes. *Patterson v. Balsamico*, 440 F.3d 104, 113 (2d Cir. 2006) (holding that defendant was not acting under color of state law for purposes of § 1983 does not affect liability under § 1981); *Dunk v. Brower*, No. 07-CV-7087 (RPP), 2009 WL 650351, at \*5 (S.D.N.Y. Mar. 12, 2009) ("Section 1981 regulates private conduct as well as government action.") (citing *Runyon v. McCrary*, 427 U.S. 160, 170 (1976)); *Frierson-Harris v. Hough*, No. 05-CV-3077 (DLC), 2006 WL 298658, at \*5 (S.D.N.Y. Feb. 7, 2006) ("Unlike Section 1983, Section 1985 creates a cause of action against private actors as well as

B. Plaintiff's Claims Arising Under 42
U.S.C. §§ 1981, 1985, and 1986

Plaintiff also alleges that defendants discriminated against Cox in violation of 42 U.S.C. §§ 1981, 1985, and 1986. As set forth below, summary judgment is warranted because plaintiff has provided no evidence of discriminatory intent on the part of the Ambulance Defendants, beyond conclusory allegations, that would allow any of these claims to survive summary judgment.

"To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1998) ("Essential to an action under Section 1981 are allegations that the defendants' actions were purposefully discriminatory, and racially motivated."). Plaintiff's claim fails as a matter of law because she has not produced *any* evidence indicating that the Ambulance Defendants had the intent to discriminate based upon race, other than noting that the Ambulance Defendants were *aware* that Cox was an African-American and a conclusory allegation that their acts were discriminatory. *See, e.g., Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 339 (2d Cir. 2000) (dismissing § 1981 claim for

failure to adequately allege discriminatory intent); *Washington v. City of New York*, No. 05-CV-8884 (LAP), 2009 WL 1685947, at *7 (S.D.N.Y. June 5, 2009) (granting summary judgment dismissing § 1981 claim where plaintiff had no evidence of discriminatory animus other than speculation and conclusory allegations); *accord Nasca v. Town of Brookhaven*, No. 05-CV-0122 (JFB), 2008 WL 4426906, at *15 (E.D.N.Y. Sept. 25, 2008); *Carson v. Lewis*, 35 F. Supp. 2d 250, 269 (E.D.N.Y. 1999) ("[N]aked assertion[s] by plaintiff[s] that race was a motivating factor without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race [are] too conclusory. . ."). Because a reasonable jury could not find that the Ambulance Defendants intended to discriminate based on race merely based on the EMTs' awareness that Cox was African-American, summary judgment for the Ambulance Defendants on the Section 1981 claim is appropriate.

Section 1985(3) prohibits two or more persons from conspiring for the purpose of depriving any person of the equal protection of the laws, or of equal privileges and immunities under the laws.[8] In order to establish a claim under § 1985(3), plaintiff must establish four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; [and] (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or

---

those acting under color of state law."); *Puglisi v. Underhill Park Taxpayer Assoc.*, 947 F. Supp. 673, 689 (S.D.N.Y. 1996) (noting that § 1985 does not include a state action requirement). However, as noted below, those claims cannot survive summary judgment on other grounds.

---

[8] Although plaintiff has failed to specify which subsection of 42 U.S.C. § 1985 he brings his claim under, it is clear from the facts that only § 1985(3) would be potentially applicable to the present case.

deprived of any right of a citizen of the United States." *Mian*, 7 F.3d at 1087. The conspiracy must be motivated "by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). As with the § 1981 claim, plaintiff only offers conclusory allegations that the actions involved discriminatory animus, merely asserting that the Ambulance Defendants knew that Cox was both African-American and disabled. Because there is no evidence of racial or other class-based animus on the record, the Ambulance Defendants are entitled to summary judgment on plaintiff's § 1985 claim. *See Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) (holding that district court properly granted summary judgment dismissing § 1985 claim where plaintiff only offered conclusory allegations of racial discrimination); *Nasca*, 2008 WL 4426906, at *15 (granting summary judgment, dismissing § 1985 claim based on lack of evidence on record of any racial or class-based animus); *accord Datri v. The Incorporated Village of Bellport*, No. 04-CV-3497 (DRH), 2006 WL 2385429, at *7 (E.D.N.Y. Aug. 17, 2006), *aff'd*, 308 F. App'x. 4665 (2d Cir. 2008).

Finally, the Ambulance Defendants are also entitled to summary judgment on plaintiff's § 1986 claim because it is well-settled that "a § 1986 claim must be predicated upon a valid § 1985 claim." *Mian*, 7 F.3d at 1088. Because the Court has found that plaintiff's § 1985 claim against the Ambulance Defendants must be dismissed, the § 1986 claim must be dismissed as well. *See Nasca*, 2008 WL 4426906, at *15 (dismissing § 1986 claim where no valid § 1985 claim existed); *accord Lehman v. Kornblau*, 134 F.Supp.2d 281, 289 (E.D.N.Y. 2001); *Altschuler v. Univ. of Pa. Law School*, No. 95-

CV-0249 (LLS), 1997 WL 129394, at *17 (S.D.N.Y. Mar. 21, 1997); *Augustine v. Reid*, 882 F.Supp. 50, 54 (E.D.N.Y.1995).

Accordingly, summary judgment for the Ambulance Defendants is warranted on plaintiff's claims arising under 42 U.S.C. §§ 1981, 1985, and 1986.

## C. New York Negligence and Wrongful Death Claims[9]

Plaintiff alleges claims for negligence and wrongful death under New York state law. For the reasons discussed below, the Court concludes that summary judgment is warranted, dismissing all of plaintiff's state law claims against the Ambulance Defendants. Specifically, as a threshold matter, the Ambulance Defendants are entitled to summary judgment because the plaintiff failed to plead *gross* negligence as required under Public Health Law § 3013 and never sought leave to amend the complaint. Furthermore, even if the plaintiff had properly pled gross negligence in the amended

---

[9] Although the Court has dismissed all the federal claims against the Ambulance Defendants, the Court continues to possess supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the claims alleged under New York state law against the remaining defendants because federal claims remain against them (including claims under § 1983 against the county and police officer defendants), and those claims "form part of the same case or controversy," as the state law claims against the Ambulance Defendants. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (vacating dismissal of state law claims against defendant where § 1983 claim remained against other defendants) (citing 28 U.S.C. § 1367(a) ("[S]upplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.")).

complaint, plaintiff's claims would still fail as a matter of law, because the unsworn expert report submitted by plaintiff is inadmissible on summary judgment and, thus, plaintiff has failed to adduce any evidence regarding the applicable standard of care owed by the Ambulance Defendants. Finally, even assuming that the proffered unsworn report was admissible, the Court concludes that the expert testimony would be insufficient to allow this claim to survive summary judgment because it fails to offer the appropriate standard of care where police officers direct the EMTs not to provide medical treatment. Moreover, even if plaintiff's expert had established the relevant standard of care, plaintiff has failed to offer sufficient evidence from which a rational jury could conclude that the Ambulance Defendants' conduct constituted a gross deviation from such standard.

In New York, in an action for negligence, a plaintiff must prove three elements: "'(1) the existence of a duty on defendant's part to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Distr.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (N.Y. 1981)). The negligence determination is also determinative of the plaintiff's wrongful death claim, because "[t]o succeed on a cause of action to recover damages for wrongful death, the decedent's personal representative must establish, *inter alia*, that the defendant's wrongful act, neglect, or default caused the decedent's death." *Eberts v. Makarczuk*, 52 A.D.3d 772, 772-73, 861 N.Y.S.2d 731 (N.Y. App. Div. 2008); *see also Chong v. N.Y. City Tr. Auth.*, 83 A.D.2d 546, 547, 441 N.Y.S.2d 24 (N.Y. 1981) (defining elements of wrongful death claim as: (1) death of a human being; (2) negligence of a defendant causing death; (3) survival of distributees suffering pecuniary loss because of the death;

and (4) appointment of a personal representative of the decedent).

The parties do not dispute that in order for the Ambulance Defendants to be liable under either of plaintiff's New York law claims, the plaintiff must demonstrate *gross* negligence, rather than plain vanilla negligence. Under New York Public Health Law § 3013(1), a volunteer ambulance company and its members can only be held liable for their acts or omissions causing injury or death arising from gross negligence. *Kowal v. Deer Park Fire Dist.*, 13 A.D.3d 489, 491, 787 N.Y.S.2d 352 (N.Y. App. Div. 2004) ("[D]efendants, in view of their status as a voluntary ambulance service, would not be liable unless it is established that the plaintiff's decedent's injury and death were caused by their gross negligence") (citing N.Y. Public Health Law § 3013(1)); *accord Rider v. Gaslight Tavern Corp*, 125 A.D.2d 144, 147, 512 N.Y.S.2d 553 (N.Y. App. Div. 1987). Accordingly, since the South Country Ambulance company and its EMTs are volunteers, plaintiff is required to demonstrate gross negligence, which "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, USA v. Jeweler's Protection Services*, 81 N.Y.2d 821, 823-24 (N.Y. 1993). "[G]ross negligence has been termed failure to exercise even slight care." *Food Pageant, Inc. v. Consolidated Edison Co., Inc.*, 54 N.Y.2d 167, 172, 445 N.Y.S.2d 60 (N.Y. 1981).

As a threshold matter, the Ambulance Defendants are entitled to summary judgment because the Amended Complaint does not include any allegations of *gross* negligence on the part of the Ambulance Defendants, in either the negligence or wrongful death claims. *See, e.g., O'Leary v. Greenport Fire Dept.*, 276 A.D.2d 539, 540-41, 714 N.Y.S.2d

451 (N.Y. App. Div. 2000) (granting summary judgment to defendant volunteer EMTs where N.Y. Public Health Law § 3013(1) required a showing of gross negligence and "plaintiffs failed to plead gross negligence, and never sought leave to amend the complaint"). However, for the reasons discussed below, even if the plaintiff had properly pled gross negligence in the amended complaint, her claims would still fail as a matter of law because she has failed to produce sufficient evidence regarding the applicable standard of care owed by the Ambulance Defendants, or that the Ambulance Defendants were grossly negligent, to survive summary judgment.

As stated above, in order to prevail on her state law causes of action, plaintiff needs to demonstrate the relevant standard of care owed by the Ambulance Defendants to decedent and a gross deviation from such standard. Under New York law, in cases involving injuries arising from medical acts or omissions, it is generally incumbent on the plaintiff to present expert testimony on the relevant standard of care. *Cregan v. Sachs*, 879 N.Y.S.2d 440, 446 (N.Y. App. Div. 2009) ("'To establish what the existing standard is or that there has been a departure from it, because laymen ordinarily are not deemed possessed of a sufficient knowledge, training or experience to have attained the competence to testify on this subject, a plaintiff nearly always will be required to produce expert testimony.'") (quoting *Topel v. Long Is. Jewish Med. Ctr.*, 55 N.Y.2d 682, 689 (N.Y. 1981)); *see, e.g., Mann v. Western Area Volunteer Emergency Srvs., Inc.,* 816 N.Y.S.2d 697 (N.Y. Sup. Ct. 2006) (denying summary judgment where plaintiff submitted expert affidavits creating a question of fact whether volunteer ambulance company was grossly negligent for responding with an ambulance not equipped with a heart defibrilator).

In the instant case, plaintiff has submitted the unsworn expert report of Dr. John L. Coulehan, dated November 19, 2009. (Pl.'s Supp. Decl., Ex. B.)[10] The Ambulance Defendants argue the Dr. Coulehan's unsworn opinion is inadmissible as expert testimony and, in any event, is insufficient to raise an issue of fact on this claim that survives summary judgment. For the reasons set forth below, the Court agrees.

As an initial matter, courts in the Second Circuit have consistently held that "unsworn

---

[10] At oral argument on August 24, 2009, plaintiff requested an opportunity to submit expert testimony regarding the standard of care provided by the defendants—namely, Dr. Lone Thanning would provide expert testimony that the care provided by the Ambulance Defendants and defendant Brookhaven was insufficient. Although the Court granted plaintiff's request, the Court agrees with the parties that the only proffered expert testimony on behalf of the plaintiff is the unsworn expert report by Dr. John L. Coulehan. First, on November 24, 2009, plaintiff filed a supplemental declaration in support of plaintiff's memorandum of law in opposition to the Ambulance Defendants' motion for summary judgment, which included the declaration of Dr. Thanning and an unsworn expert report by Dr. John L. Coulehan. Second, at the conference held on November 10, 2010, plaintiff's counsel informed the Court and the parties that he intended to replace Dr. Thanning with another expert, Dr. William L. Manion. Finally, as noted *supra*, at the conference held on February 7, 2011, the Ambulance Defendants orally renewed their motion for summary judgment and counsel for the Ambulance Defendants and plaintiff both agreed that Dr. Manion's expert testimony is not related to the Ambulance Defendants. Therefore, the Court concludes, for the reasons stated above, that the only proffered expert testimony provided by plaintiff, was provided through the unsworn report by Dr. John L. Coulehan.

expert reports do not satisfy the admissibility requirements of Fed.R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support." *Berk v. St. Vincent's Hosp. and Med. Ctr.,* 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005)); s*ee also Gotlin v. Lederman,* 616 F.Supp.2d 376, 389 (E.D.N.Y. 2009); *accord Brazier v. Hasbro, Inc.,* No. 99 Civ. 11258, 2004 WL 1497607, at *2 (S.D.N.Y. July 6, 2004) ("The submission of unsworn letters is an 'inappropriate response' to a summary judgment motion, and factual assertions made in such letters are 'properly disregarded by the court.'" (quoting *United States v. All Right, Title & Interest in Real Property & Appurtenances,* 77 F.3d 648, 657-58 (2d Cir. 1996))). However, an exception to the rule arises when the *defendants* have submitted a plaintiff's unsworn expert report in support of their motion for summary judgment and relied upon it in their moving papers, thereby waiving any objections to the admissibility of such report. *See Capobianco v. City of New York,* 422 F.3d 47, 55 (2d Cir. 2005) (emphasis added); *see also Glowczenski v. Taser Intern. Inc.,* No. CV04-4052 (WDW), 2010 WL 1957289, *3 (E.D.N.Y. May 13, 2010). Here, the report of Dr. Coulehan, offered in the form of a letter addressed to plaintiff's counsel, was submitted by plaintiff and is unsworn, and, thus, it is inadmissible on summary judgment.[11] Accordingly, even if the plaintiff had properly pled gross negligence in the amended complaint, her claims would still fail as a matter of law because she has failed to produce admissible expert testimony to demonstrate the relevant standard of care owed by the Ambulance Defendants to decedent and a gross deviation from such standard.

Furthermore, even assuming that Dr. Coulehan's unsworn report was admissible, the Court concludes that it would still be insufficient to allow plaintiff's claim to survive summary judgment because plaintiff's expert does not offer any expert testimony regarding the proper standard of care, let alone that the Ambulance Defendants grossly departed from such standard, under the particular circumstances of this case—specifically, where decedent was in police custody and the police officers repeatedly rebuffed the Ambulance Defendants' attempts to provide medical care to decedent. Instead, Dr. Coulehan claims that the relevant standard of care is established by New York State EMS and EMT protocols.[12] However, after reviewing the rules and protocols submitted by plaintiff and exclusively relied upon by Dr. Coulehan, the Court concludes that, even with his testimony, no rational juror could conclude that the Ambulance Defendants grossly departed from the proper standard of care under the undisputed facts of this case.[13]

---

[11] In fact, even after the Ambulance Defendants raised the issue of the report being unsworn in their Reply Affirmation, dated January 14, 2010, plaintiff's counsel did not request an opportunity to re-submit a sworn report, but rather stated during the telephone conference of February 7, 2011, that the matter was fully submitted for the Court's determination.

[12] The Court notes that the opinions within Dr. Coulehan's purported expert report, submitted as part of plaintiff's supplemental declaration on November 24, 2009, are nearly identical to the arguments within plaintiff's opposition papers submitted four months prior on July 28, 2009—namely, the relevant standard of care is established by New York State EMS and EMT protocols. (Pl.'s Mem. in Opp. at 12-19 & Ex. P.)

[13] Defendants also argue that Dr. Coulehan lacks sufficient qualifications to testify regarding the applicable standard of care owed to decedent by

the defendants and whether the defendants grossly departed from such standard. Under Rule 702, the Court must determine whether the expert is qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. A court should look at the totality of the witness' qualifications in making this assessment. *See, e.g., Rosco, Inc. v. Mirror Lite Co.,* 506 F. Supp. 2d 137, 144-45 (E.D.N.Y. 2007) ("A court must consider the 'totality of a witness' [ ] background when evaluating the witness'[ ] qualifications to testify as an expert.") (quoting 29 WRIGHT & GOLD, FED. PRAC. & PROC. § 6265, at 246 (1997)); *accord Keenan v. Mine Safety Appliances Co.,* No. CV-03-0710 (TCP)(ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006). Here, it is undisputed that Dr. Coulehan is not a doctor specializing in emergency medical care. Dr. Coulehan states that, from the time of the completion of his residencies to his retirement in 2007, he has "directed the ethics and humanities program at Stony Brook Medical School and chaired the ethics committee and ethics case consultation service at Univeristy Hospital." (Pl.'s Supp. Decl. in Opp., Ex. B at 2.) Furthermore, Dr. Coulehan has "authored over 200 articles and book chapters in medical literature ranging in topic from clinical trials of depression treatment in primary care and studies of heart disease among Navajo Indians to essays on medical humanities and the physician client relationship." *Id.* Besides not being a doctor specializing in emergency medical care or certified as an EMT, Dr. Coulehan has not submitted any other form of documentary proof attesting to his qualifications to opine on the subject matter at hand. Thus, defendants contend that, as a medical ethicist, Dr. Coulehan would not be competent to testify regarding the relevant standard of care owed to the decedent under the specific circumstances of this case—namely, the standard of care owed by the EMTs where it is undisputed that the patient was in custody of police officers, the EMTs repeatedly attempted to provide medical assistance, and the police officers repeatedly ordered the EMTs not to provide treatment based on their characterization of the patient as being violent and emotionally disturbed. *See Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997) ("In some

Dr. Coulehan points to the New York Bureau of EMS Policy Statement 98-05, which states:

> Pursuant to the provisions of Public Health Law, the individual having the highest level of prehospital certification and who is responding with authority, 'has a duty to act' and therefore is responsible for providing and/or directing emergency medical care and the transportation of a patient.

(Pl.'s Supp. Decl. in Opp., Ex. B at 8-9; Pl.'s Mem. in Opp. at 12 & Ex. P.) In addition, Dr. Coulehan claims that the Ambulance Defendants failed to comply with a number of specific requirements dictated by EMS protocols, including, requirements that EMTs: (1) interact with a patient upon arrival to the scene to determine patient orientation; (2) frequently obtain vital signs and conduct other important assessments relevant to the patient's care; (3) administer oxygen to patients in need, including patients with a altered mental status; and (4) leave a properly completed Prehospital Care Report with the

circumstances, therefore, a district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their expertise is too general or too deficient."). However, the Court need not address this issue because, even assuming *arguendo* that Dr. Coulehan was qualified to testify about the applicable standard of care, no rational jury could conclude that the defendants grossly departed from such standard under the circumstances of this case given the rules and protocols exclusively relied upon by Dr. Coulehan and the other undisputed facts in this case.

hospital when a patient is admitted. (*Id.* at 9-10; *Id.* at 13-14 & Ex. P.)

However, in reviewing the rules and protocols submitted by plaintiff as exhibits in their entirety, and cited by Dr. Coulehan, the Court concludes that they do not delineate the standard of care for EMTs responding to the specific circumstances provided by the facts posed here, *where it is undisputed that the patient is in custody of police officers who ordered the EMTs to not provide treatment*, based on their characterization of the patient as being violent and emotionally disturbed.

First, EMS Policy Statement 98-05, which Dr. Coulehan points to as establishing that the Ambulance Defendants, rather than the police officers, had chief responsibility for providing medical care, includes language which contemplates police command over potentially dangerous situations:

> It is recognized that patient care may be provided in a variety of hazardous conditions and that overall scene command is the responsibility of locally designated officials (Police, Fire, Health, Municipal, etc.).

(Pl.'s Mem. in Opp., Ex. P.) Second, the specific EMS protocol regarding dealing with patients who have an altered mental status specifically dictates that EMTs should stand down and remain at a safe distance if there exists "potential or actual danger," and that the police should be involved for safety purposes:

> Assess the situation for potential or actual danger. If the scene/situation is not safe, retreat to a safe location, create a safe zone and obtain additional assistance from a police agency.

(Pl.'s Mem. in Opp., Ex. P.; Defs.' Reply Aff., Ex. A.) The same policy then reiterates, in bolded text, set apart from the remainder of the policy within a shaded text box:

> All suicidal or violent threats or gestures must be taken seriously. These patients should be in police custody if they pose a danger to themselves or others.

(*Id.*)

Based on the foregoing, the EMS policy statement and protocols, upon which plaintiff and her expert exclusively rely to prove the claim, do not establish the relevant standard of care for EMTs where police have custody of individuals who are emotionally disturbed, who are violent or potentially violent and where the police have ordered the EMTs not to provide medical care.[14] Accordingly,

---

[14] The Court notes that plaintiff also cites violation of several EMS protocols unrelated to the alleged failure of the Ambulance Defendants to provide medical care at the residence and in the ambulance, all involving the Prehospital Care Report ("PCR"). Specifically, plaintiff alleges that the PCR was deficient in content, and should have been left at the hospital on the day of the incident, as required by EMS policy. (Pl.'s Mem. in Opp. At 12-13, 17-18, Ex. P.) However, assuming *arguendo* that the EMS policy establishes the proper standard of care, the plaintiff has not produced *any* evidence which indicates that the late filing and other technical defects in the PCR caused the exacerbation of decedent's injuries or proximately caused his death. Indeed, the Court finds that no reasonable jury could find that the defects in the PCR were the cause of the injuries at issue, because: (1) it is undisputed that the police officers ordered the Ambulance Defendants to stand back and not treat Cox, thereby depriving them of the opportunity to collect meaningful information for the PCR; and

because the EMS policy statement and protocols relied upon by the expert do not establish the relevant standard of care, the Court concludes that the proffered report is insufficient to raise a genuine issue of fact on that question that survives summary judgment.

Finally, even assuming that the rules and protocols cited by the expert establish the relevant standard of care, plaintiff has failed to adduce any evidence that there was a gross deviation from such standard by the Ambulance Defendants as required under New York Public Health Law § 3013(1). *See Kowal*, 13 A.D.3d at 491 ("[D]efendants, in view of their status as a voluntary ambulance service, would not be liable unless it is established that the plaintiff's decedent's injury and death were caused by their gross negligence.") Here, it is undisputed that the decedent was an emotionally disturbed person and violent. (Pl.'s Counter 56.1 ¶ 43; *see supra* footnote 3.) Furthermore, it is undisputed that the EMTs continually attempted to provide medical care to Cox from the time that they arrived at the residence until the ambulance arrived at the hospital. First, after arriving at the residence, EMT Smith prepared

a rebreather mask to supply oxygen to Cox but the officers ordered him not to apply the mask. (Pl.'s Counter 56.1 ¶¶ 59, 60.) EMT Smith then advised the police officers that Cox should be repositioned on the stretcher so that he was face up, with his head at the other end of the stretcher, but he was rebuffed by the police officers who told him that repositioning Cox would be unsafe. (*Id*. ¶¶ 62, 63.) During the ambulance ride, there were three police officers restraining Cox and the police officers directed EMT Smith to not provide Cox with medical treatment. (Pl.'s 56.1 ¶¶ 11, 14.) After EMT Smith again attempted to apply a rebreather mask, the police again ordered him not to do so because Cox was combative. (Pl.'s Counter 56.1 ¶ 64; Pl.'s Ex. G at 93.) Finally, once the ambulance arrived at the hospital, the police officers would not allow medical treatment and Cox to be transferred to a hospital stretcher without hospital restraints. (*Id*. ¶¶ 70, 146.) Except for the very last line of his report, in which he concludes that "[the EMTs] behavior was a gross departure from good and acceptable standards for emergency medical personnel," Dr. Coulehan fails to state any behaviors that were a gross deviation from the standard of care established by the rules and protocols. (*See* Pl.'s Supp. Decl. in Opp., Ex. B at 12.) It appears that Dr. Coulehan bases his conclusion on his opinion that "the patient's welfare should have outweighed considerations of personal safety," and that the EMTs could have made further attempts to provide medical care, including attempts to administer oxygen. (*See* Pl.'s Supp. Decl. in Opp., Ex. B at 8.) First, these conclusory remarks do not sufficiently establish what the relevant standard of care is, or that there has been a *gross* departure from it, for the circumstances presented in this case—namely, the evaluation and treatment of a patient in police custody where officers

---

(2) any information that was or could have been included in the PCR could not have had any impact on the hospital's treatment of decedent, given that it is undisputed that he was in cardiac arrest by the time the police officers allowed Cox to be accessed or treated by hospital employees. Accordingly, to the extent that plaintiff has attempted to state claims for gross negligence and wrongful death related to improper handling of the PCR, summary judgment is warranted. *See, e.g., Siegel v. Metro-North Commuter Railroad Co.*, No. 07-CV-6025 (DC), 2009 WL 889985, at *1 (S.D.N.Y. Apr. 1, 2009) (granting summary judgment where no reasonable jury could find that plaintiff proved causation); *accord Fragrance Express Dot Com, Inc. v. Standard & Poor's Corp.*, 314 F. Supp. 2d 189, 195 (S.D.N.Y. 2003).

repeatedly refused the EMTs' attempts to provide medical care. Furthermore, it is undisputed that the EMTs made numerous attempts to provide medical care, including, specifically, attempts to provide oxygen in the form of a rebreather mask. Second, Dr. Coulehan's opinion that the EMTs should have disregarded considerations of personal safety is inapposite. The undisputed record demonstrates that the EMTs did not withhold medical care because of concerns for their personal safety, but rather because they were *ordered* not to provide medical care by the police officers who had the decedent in custody the entire time the EMTs were with him.[15] Indeed, the undisputed record demonstrates that the EMTs continued to attempt to provide medical care despite previously being ordered to stand down because Cox was violent. In short, plaintiff has failed to provide any evidence that the EMTs "evince[d] a reckless disregard for the rights [of the decedent] . . . or intentional wrongdoing.'" *Colnaghi, USA v. Jeweler's Protection Services*, 81 N.Y.2d 821, 823-24 (N.Y. 1993); *see also See Food Pageant*, 54 N.Y.2d at 172 ("[G]ross negligence has been termed failure to exercise even slight care."); *accord Harvey v. Plains Twp. Police Dept.*, 421 F.3d 185, 195-196 (3d Cir. 2005) ("[A] private citizen acting at the orders of a police officer is not generally acting in a willful manner, especially when that citizen has no self-interest in taking the action.")

Thus, even if the expert report was admissible, plaintiff has failed to demonstrate that the Ambulance Defendants were grossly negligent where it is undisputed that they repeatedly attempted to render medical care, and were denied by the police officers who had the decedent in custody. Accordingly, because plaintiff failed to develop evidence from an expert witness to establish a critical component of their prima facie case, summary judgment is warranted. *Deadwyler v. North Shore Univ. Hosp. at Plainview*, 866 N.Y.2d 306, 307 (N.Y. App. Div. 2008) (affirming judgment as a matter of law because "plaintiff presented no evidence from an expert witness as to the applicable standard of care" and therefore "failed to establish a prima facie case of medical malpractice"); *see also Harper v. Findling*, 832 N.Y.S.2d 266, 267 (N.Y. App. Div. 2007).

In sum, pursuant to Public Health Law § 3013, the Ambulance Defendants could be held liable only if their emergency medical technicians were grossly negligent in rendering emergency medical assistance to decedent. As a threshold matter, the Ambulance Defendants are entitled to summary judgment because the plaintiff failed to plead *gross* negligence and never sought leave to amend the complaint. In addition, even if the plaintiff had properly pled gross negligence in the amended complaint, plaintiff's claims would still fail as a matter of law, because the unsworn expert report submitted by plaintiff is inadmissible on summary judgment and, thus, plaintiff has failed to produce sufficient evidence regarding the applicable standard of care owed by the Ambulance Defendants and that the Ambulance Defendants were grossly negligent. Finally, even assuming that the proffered unsworn report was admissible, the Court concludes that it would be insufficient to raise a triable issue of fact that survives summary judgment because the rules and protocols upon which it relies fail to establish the applicable standard of care under the

---

[15] Furthermore, for the reasons discussed *supra*, the rules and protocols cited by plaintiff do not provide the authority for medical personnel to ignore orders by the police, and based on its own independent research, the Court is unaware of any law that exempts EMS professionals from following police orders.

particular circumstances of this case. Moreover, even if it did establish the standard of care, plaintiff's evidence fails to provide a sufficient basis for a rational jury to conclude that the Ambulance Defendants were grossly negligent in failing to provide care where it is undisputed the police officers directed them not to provide care. Accordingly, summary judgment is granted on plaintiff's state law claims for negligence and wrongful death as against the Ambulance Defendants.

## IV. CONCLUSION

For the foregoing reasons, the Ambulance Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court shall terminate South Country Ambulance, EMT L. Smith, EMT D. Totong, EMT S. Al Qadri and Ambulance Driver M. Sneed as defendants from this civil action.

SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated:     June 15, 2011
           Central Islip, New York


* * *

The attorney for plaintiff is Frederick K. Brewington, Esq. of the Law Offices of Frederick K. Brewington, 556 Peninsula Boulevard, Hempstead, New York 11550. The attorney for defendants South Country Ambulance, EMT Smith, EMT Totong, EMT Al Qadri and Ambulance Driver Sneed is Jeffrey B. Siler of Siler & Ingber, LLP, 1399 Franklin Avenue, Suite 103, Garden City, New York 11530.